FILED

08/11/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0732

DA 23-0732

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 187

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JAKE KENNETH LEE BURGHDUFF,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Prairie, Cause No. DC 2023-2
Honorable Olivia Rieger, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Tammy A. Hinderman, Appellate Defender Division Administrator,
Jeavon C. Lang, Managing Appellate Defender, Helena, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

        Daniel Z. Rice, Prairie County Attorney, Meghann F. Paddock, Daniel
M. Guzynski, Special Deputy County Attorneys, Terry, Montana

Submitted on Briefs:  May 27, 2026
Decided:  August 11, 2026

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Jake Kenneth Lee Burghduff (Burghduff) was charged by Information in the Seventh Judicial District Court, Prairie County, with Deliberate Homicide under § 45-5-102(1)(b), MCA, commonly known as the "felony murder rule." The State alternatively alleged Burghduff was "legally accountable for the commission of the offense of aggravated assault and/or assault with a weapon," and that, during the course of the commission of one or both of those offenses, Burghduff "or another person accountable for that offense/those offenses," "caused the death of Isaac Carrier." The aggravated assault charge was premised upon the setting of Isaac's residence on fire, and the assault with a weapon charge was premised upon Isaac being shot, both by Sterling Brown, as asserted by the State for purposes of the charges against Burghduff. At the close of the State's case, Burghduff moved to dismiss the Deliberate Homicide charge for insufficient evidence.[1] The District Court granted the motion in part, dismissing the aggravated assault basis for the charge, but denied the motion with respect to the alternative basis of assault with a weapon, allowing that issue to be decided by the jury, which found Burghduff guilty of Deliberate Homicide. Burghduff challenges the District Court's partial denial of his motion. We affirm.

¶2 We address the following issue:

*Did the District Court err by denying the motion to dismiss for insufficient evidence on the charge of Deliberate Homicide under the felony murder rule based on Accountability for Assault with a Weapon?*

---

[1] In his arguments, Burghduff uses the vernacular, "motion for directed verdict." "[A] motion for a directed verdict is properly deemed to be a motion to dismiss for insufficient evidence pursuant to § 46-16-403, MCA." *State v. Lord*, 2025 MT 302, ¶ 1 n.1, 425 Mont. 398, 581 P.3d 392.

2

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Isaac Carrier was killed in his apartment in Fallon, Montana, in the late evening of January 23, 2023. Isaac and his ex-wife, Katie Bivens, shared custody of their son. After their divorce, Katie married Sterling Brown. At the time of Isaac's death, he and Katie were involved in a custody dispute over their son, for which a hearing had been scheduled on January 25, 2023. Katie and Sterling believed Isaac was abusing the boy. Following Isaac's death, the State alleged in a separate criminal proceeding that Sterling shot Isaac and set his apartment on fire, causing Isaac's death. Here, the jury considered whether Burghduff was legally accountable for the commission of the offense of assault with a weapon upon Isaac, resulting in his death, and thus was guilty of Deliberate Homicide by the felony murder rule.

¶4     Katie and Sterling lived in Camp Crook, South Dakota, and Burghduff lived in Ludlow, South Dakota. Ludlow and Camp Crook are small towns near the Montana border, roughly 45 minutes apart, while Fallon lies in eastern Montana, an approximately two-three drive from the South Dakota towns.

¶5     On the evening of January 23, 2023, Sterling texted Burghduff asking if he was around. Burghduff confirmed he was at home. Sterling then sent Burghduff a video clip from the movie *The Town*, titled "We're Gonna Hurt Some People," depicting an assault and shooting in an apartment over illicit drug dealing. The clip was four minutes, twenty-seconds long. The clip begins with a soon-to-be assailant saying to another, "I need your help, I can't tell you what it is, you can never ask me about it later, and we're gonna hurt

some people." The other soon-to-be assailant responds immediately, "Whose car we gonna take?" The assailants then drive to an apartment, don masks, break down the door, and beat the victim. One assailant smashes a bottle over the victim's head, presses the broken bottle into the victim's neck, and then sledgehammers the victim's hands. The other assailant fires several shots into the victim's leg. The assailants then leave the apartment and drive away.

¶6 The text exchange between Sterling and Burghduff, which included the video clip, began at 6:16 p.m. on January 23:

> STERLING: You around?
>
> BURGHDUFF: Like at my place?
>
> STERLING: Ya
>
> BURGHDUFF: Yep
>
> STERLING: [sends the "*The Town* – 'We're Gonna Hurt Some People' | Full Scene"]
>
> BURGHDUFF: I'm confused lol
>
> STERLING: Listen to it again and let me know if I can come over
>
> BURGHDUFF: I'm still confused, we gotta hurt someone or something? Lex and the chick that works for us are in the living room lol[2]
>
> STERLING: Something like that. You available for pickup??
>
> BURGHDUFF: Yep, I can meet ya Ludlow if ya want to. Either way
>
> STERLING: Alright can't say much else on here

---

[2] Burghduff's response, "I'm still confused, we gotta hurt someone or something . . .", was sent 3 minutes and 44 seconds after Sterling instructed Burghduff to listen to the clip again.

BURGHDUFF: Makes sense, how far out are ya

STERLING: My house yet.

BURGHDUFF: Sounds good, lmk when ya get close

STERLING: Just leaving

BURGHDUFF: Sounds good. I'll just meet ya at the bar so Lex don't ask who's pickin me up lol

STERLING: [hang loose hand emoji]
.22 pistol if ya have one old one
Then we can duck some coins up

BURGHDUFF: All ours are new
Plus I'm actually out of 22 bullets

STERLING: You're good[.]

¶7    Burghduff left his residence without advising the other people there and met Sterling at a bar in Ludlow. Burghduff brought his .22 magnum Ruger revolver. Both men left their cell phones in Burghduff's truck in Ludlow and departed in Sterling's truck, with Sterling driving. Burghduff had been drinking at home earlier and brought some beer. He would later tell police that Sterling was upset with Isaac about the custody situation. The pair drove backroads through South Dakota and into eastern Montana. Around 9:45 p.m., they stopped at a gas station in Baker, Montana. Surveillance footage showed Burghduff entering the store and purchasing a red two-gallon plastic gas can, a can of engine starting fluid, and an 18-pack of Coors beer. He then filled the gas can with gasoline at the pump next to Sterling's truck. Sterling went inside to pay for all of the gas, waiting until Burghduff had finished filling the gas can before paying. Burghduff later told investigators he needed the starting fluid for use at home, and investigators found it at Burghduff's home.

5

¶8     Leaving Baker, they continued toward Fallon, another 1.5-hour drive. Burghduff would later tell police that he began to realize they were heading to Isaac's apartment in Fallon, and that he understood Sterling intended to confront or "take care of" Isaac in connection with the custody issues involving the child. During the drive, Sterling pulled out and checked a .45 pistol to determine it was loaded. Arriving in Fallon, Sterling parked on a street near to Isaac's apartment, which Burghduff would later describe as parked in a way that allowed a quick exit. Burghduff told investigators that Sterling took the .45 pistol and the gas can, and he then thought Sterling was going to kill Isaac. Burghduff reported that Sterling was gone for approximately 20–30 minutes, came "running back" with the gun and gas can, and was "huffin' and puffin.'" Sterling placed the gas can in the back of the truck, got in and drove away. Burghduff reported seeing flames as they left the area. He told police he did not ask Sterling what had happened because he "didn't want to know," thought to himself at the time that he was "an accessory," and began to drink heavily because he "just wanted to get drunk."

¶9     After the chaos that followed at Issac's apartment building into the morning of January 24, Isaac was found dead in his apartment. He had sustained a single gunshot wound to the head, and his apartment had been set on fire. Hydrocarbon testing later found gasoline on Isaac's clothing and in his bedroom. A smoke detector had been removed from Isaac's apartment and discarded in a common hallway. Three other tenants of the building escaped the fire after hearing a loud bang and commotion, including running footsteps. One tenant described quick footsteps in what sounded like cowboy boots lasting for several minutes, and smoke. One tenant pounded on doors to alert others. Two tenants saw flames

6

coming from Isaac's bedroom window. An autopsy by the state medical examiner determined the cause of death to be a gunshot wound to the head, with smoke inhalation and thermal injuries as contributory conditions. Although the manner of death was ruled to be a homicide caused by a shooting, the medical examiner noted that Isaac had been alive during the fire because he had black soot in his airways and elevated carboxyhemoglobin levels in the blood. No bullet casing was ever found, and investigators were unable to conclusively determine what caliber of gun was used to shoot Isaac.

¶10 Agent Bradley Tucker of the Department of Justice, Division of Criminal Investigation, interviewed Sterling and Katie. Sterling denied involvement with Isaac's death and denied traveling to Fallon that night. Agent Tucker did not arrest Sterling at this point. After that interview, Burghduff and Sterling exchanged Snapchat messages in an effort to coordinate their versions of their activities on the night of January 23.

¶11 Burghduff agreed to a formal voluntary interview, and drove approximately 100 miles to Spearfish, South Dakota, on February 7, 2023, to be interviewed by Agent Tucker. During the 6.5-hour interview, Burghduff initially claimed that he and Sterling had decided to "go out boozing and shooting things" and denied going to Fallon. Later in the interview, he admitted they had met at the Ludlow bar and drove to Fallon in Sterling's truck. Burghduff initially stated that Sterling brought only two long guns, and that the gas they purchased in Baker was for his own vehicle. Later, he acknowledged Sterling also brought a .45 pistol and that he had filled the gas can at Sterling's direction. Burghduff acknowledged that when he saw the video clip from *The Town*, he knew they were going to "f*** somebody up." He said he initially thought it might relate to drugs because

7

Sterling "smokes weed and stuff," but upon meeting Sterling in Ludlow, he had "an idea" the target was Isaac, although he did not realize they were heading to Isaac's apartment in Fallon until after they left the gas station in Baker. Burghduff stated that Sterling said he was going to "take care of" Isaac so the child would not go back to him. He would later admit to telling Agent Tucker that he "understood [Sterling's] reasoning" for wanting to kill Isaac. Burghduff claimed he only realized Sterling planned to murder Isaac after filling the gas can in Baker. During the drive to Fallon, Burghduff said he swapped small talk with Sterling to keep his mind off what Sterling was about to do. Burghduff said he waited in the truck in Fallon the entire time Sterling was gone, and saw flames when Sterling returned, but did not hear any gunshots because the truck windows were up and the engine was running.

¶12 After Burghduff's statement, the State charged him with Arson and Tampering with or Fabricating Physical Evidence. The State later moved to amend the Information by adding a charge of Deliberate Homicide by Accountability under the felony murder rule, premised upon alternate underlying forcible felonies. Burghduff moved to dismiss, and the District Court partially granted the motion, dismissing the Arson and Tampering charges for lack of probable cause. Consequently, the case went to trial solely on the Deliberate Homicide charge, with the State contending Burghduff was legally accountable for aggravated assault for Sterling setting Isaac's apartment on fire, and accountable for assault with a weapon for Sterling's shooting of Isaac, both causing Isaac's death.

¶13 At trial, the State called as witnesses Isaac's mother; the apartment residents, who described the sounds, commotion, smoke, and fire; two deputy state fire marshals who

8

analyzed the fire and fire scene; the state medical examiner who performed the autopsy; a forensic analyst who extracted data from Burghduff's and Sterling's phones; and Agent Tucker, who recounted Burghduff's statements and played portions of the February 7 interview. The State did not call Sterling as a witness. At the close of the State's case, Burghduff moved to dismiss for insufficient evidence.

¶14 The District Court partially granted Burghduff's motion. The court ruled the State had failed to present sufficient evidence to prove that Burghduff was legally accountable for Sterling setting Isaac's apartment on fire[3] and dismissed the alternative felony murder charge based on aggravated assault. The court denied the motion with respect to the alternative felony murder charge based on assault with a weapon, reasoning there was sufficient evidence for the jury to determine that Burghduff was legally accountable for assault with a weapon by Sterling.[4]

¶15 The jury found Burghduff guilty of Deliberate Homicide under the felony murder rule based on legal accountability for assault with a weapon. At sentencing, the District

---

[3] The District Court repeatedly emphasized that it was not saying that Sterling Brown had set the fire, or committed any crime, as Sterling had yet to be tried, but merely that the State had so alleged for purposes of the charges against Burghduff.

[4] The court further explained how its ruling would affect what the State could argue to the jury:

> [The State argues] that the fire was more information that caused, or was an agreement, it's evidence of an agreement, and the Defendant's culpability. . . . Whether Sterling Brown and Jake Burghduff had an agreement based upon the evidence. . . . [T]his is all relevant information as to whether or not the Defendant knew, had the purpose, and agreed to going with Sterling Brown to Fallon, Montana, and committing the offense of assault with a weapon. . . . I'm not going to say that the State cannot say that the Defendant's purchase of a gas can wasn't [sic] his agreement. But I am not going to allow the State to [] argue to the jury that the Defendant is legally accountable for Sterling Brown starting a fire.

9

Court imposed a sentence of fifteen years with the Department of Corrections, with ten years suspended, along with restitution.

¶16 Burghduff appeals his conviction, contending the District Court erred by denying the entirety of his motion to dismiss and allowing the case to go to the jury.

## STANDARD OF REVIEW

¶17 "We review de novo the sufficiency of evidence to convict a defendant." *State v. Rossbach*, 2024 MT 157, ¶ 21, 417 Mont. 287, 553 P.3d 402 (citing *State v. Boyd*, 2021 MT 323, ¶ 12, 407 Mont. 1, 501 P.3d 409). This Court reviews the sufficiency of the evidence by asking whether, when the evidence is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Lantis*, 1998 MT 172, ¶ 32, 289 Mont. 480, 962 P.2d 1169 (citing *State v. Bower*, 254 Mont. 1, 6, 833 P.2d 1106, 1110 (1992)).

## DISCUSSION

¶18 *Did the District Court err by denying the motion to dismiss for insufficient evidence on the charge of Deliberate Homicide under the felony murder rule based on Accountability for Assault with a Weapon?*

¶19 Section 45-5-102(1)(b), MCA, "Deliberate homicide," provides in part:

(1) A person commits the offense of deliberate homicide if:

. . .

(b) the person . . . is legally accountable for the attempt or commission of . . . assault with a weapon, . . . and in the course of the [assault with a weapon] or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being.

Section 45-2-302(3), MCA, "When accountability exists," provides:

10

> A person is legally accountable for the conduct of another when:
>
> .   .   .
>
> (3) either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense.

Thus, Montana law permits conviction of Deliberate Homicide based on a person's legal accountability for a listed forcible felony (here, assault with a weapon) that caused the death of another human being, called the felony murder rule, as set forth in § 45-5-102(1)(b), MCA. *See e.g. State v. Miller*, 231 Mont. 497, 757 P.2d 1275 (1988) (defendant was convicted by a jury of "deliberate homicide under the felony murder rule, robbery and felony assault by accountability").

¶20     Burghduff's central argument is that the State failed to present sufficient evidence to prove he was legally accountable for Sterling's assault with a weapon of Isaac. He argues the State's theory of accomplice liability depended entirely on proving an agreement between he and Sterling, yet the record contained no such evidence, and that, as charged, the State was required to prove he knew Sterling intended to shoot Isaac, not merely threaten or scare him. Starting with the initial text messages between him and Sterling, Burghduff points out that none of the messages mentioned Fallon, Montana, Isaac, or the custody dispute. He states he replied too quickly to Sterling's instruction to re-watch the video clip to have watched the entire clip a second time, and that he could not remember key details about it in his police interview, telling Agent Tucker he believed the clip related to drugs. He notes that he told Tucker that he did not think the trip involved "actually

11

murdering somebody," and argues there was no evidence "he knew about Sterling's plan to shoot Isaac until after they had already purchased the gas in Baker and Sterling was driving to Fallon," because he began to suspect something more serious only about halfway between Baker and Fallon, when Sterling pulled out the .45 pistol. Burghduff asserts that the most the State proved was that he was an unwilling passenger along for the ride, while Sterling acted entirely on his own by driving to the scene, bringing his own gun, shooting Isaac, and starting the fire.

¶21 Burghduff further argues that, even if an agreement between he and Sterling could be inferred, the State failed to prove he took any voluntary act to aid Sterling in committing the offense of assault with a weapon. He contends that his filling of the gas can in Baker does not qualify, as there was no evidence he knew Sterling intended to use the gas in connection with assaulting Isaac, and he was acquitted by the District Court of the assault charge premised upon setting Isaac's apartment on fire, thus making reliance on the gas can evidence improper.[5] Burghduff points out that, after Sterling exited the vehicle in Fallon, he was physically unable to assist because he could not see the apartment building, had no phone, and did not have the truck keys. Burghduff dismisses the State's reliance on his statement that he knew he was "an accessory," noting that, as a young ranch hand,

_____

[5] As noted above, the District Court dismissed the fire-related charges but permitted the State to argue that Burghduff's actions with the gas can were nonetheless relevant to "whether or not the Defendant knew, had the purpose, and agreed to going with Sterling Brown to Fallon, Montana, and committing the offense of assault with a weapon." That ruling is not challenged on appeal.

12

he did not understand its legal meaning, and it did not constitute an admission of the elements the State was required to prove.[6]

¶22 Burghduff argues the evidence here must be found insufficient under our decisions in *State v. Flatley*, 2000 MT 295, 302 Mont. 314, 14 P.3d 1195, and *State ex rel. Murphy v. McKinnon*, 171 Mont. 120, 556 P.2d 906 (1976). In *Flatley*, Defendant Flatley attempted to initiate a drug deal that did not occur because the drug dealer was away fishing. *Flatley*, ¶¶ 6, 15. Later, a drug sale occurred between the same drug dealer and one of Flatley's associates, and while Flatley was present, he took no active role. *Flatley*, ¶ 16. We found insufficient evidence to convict Flatley of accountability for the subsequent drug sale because his earlier conduct was not sufficiently connected to the subsequent transaction, given the associate's testimony that Flatley had declined to "hook him up" with the dealer, and "there was no evidence Flatley ever discussed" the subsequent drug transaction. *Flatley*, ¶¶ 16–17. Burghduff argues that, like the defendant in *Flatley*, any early involvement on his part with Sterling, such as meeting Sterling in Ludlow and then driving toward Fallon, was not sufficiently connected to Sterling's later actions at Isaac's apartment.

---

[6] Burghduff's argument includes the contention that the State's charging decisions "were confusing from the beginning," and he characterizes the charges as "deliberate homicide but twice removed," first through felony murder and again through accountability. However, he does not challenge the legal sufficiency of the charging documents. *See e.g. State v. Wilson*, 2007 MT 327, ¶ 25, 340 Mont. 191, 172 P.3d 1264 ("We apply the 'common understanding' rule to determine if the charging language of a document allows a person to understand the charges against him. . . . Under this standard, 'the test of the sufficiency of a charging document is whether the defendant is apprised of the charges and whether he will be surprised.'" (citations omitted)). Further, Burghduff's arguments do not challenge the State's contention that an assault with a weapon occurred which caused the death of another human being.

¶23 In *Murphy*, defendant Murphy arrived at a bar with two associates, one of whom attacked and killed the bar owner. *Murphy*, 171 Mont. at 121, 556 P.2d at 907. Murphy and the attacking associate had previously discussed that the bar owner was going to testify against them at an upcoming unrelated trial. *Murphy*, 171 Mont. at 125, 556 P.2d at 909. Murphy was charged with deliberate homicide by accountability. Murphy did not participate in the attack, stood away from the scene, and stated only that the decedent "had this coming." *Murphy*, 171 Mont. at 125, 556 P.2d at 909. We dismissed the charges by a writ of supervisory control, explained that accountability "contemplate[s] a more active role" than mere presence at the scene of a crime, and reiterated that the "mere presence at the scene of a crime is insufficient to establish criminal responsibility." *Murphy*, 171 Mont. at 125, 556 P.2d at 909 (citing *State v. McComas*, 85 Mont. 428, 278 P. 993 (1929)). We reasoned that the supporting affidavit for the charge did not allege Murphy went to the bar with the purpose of harming the bar owner and was otherwise devoid of any facts showing affirmative action on Murphy's part. *Murphy*, 171 Mont. at 125, 556 P.2d at 909. Burghduff argues that, like the defendant in *Murphy*, his mere presence at the scene, without any active role in helping Sterling shoot Isaac, is insufficient to establish criminal accountability for deliberate homicide.

¶24 In analyzing Burghduff's arguments, we note that "accountability is not a separate offense from the crime for which the actor assumes accountability but 'is merely a conduit by which one is held criminally accountable for the acts of another.'" *State v. Kline*, 2016 MT 177, ¶ 13, 384 Mont. 157, 376 P.3d 132 (quoting *In re B.W.*, 2014 MT 27, ¶ 19, 373 Mont. 409, 318 P.3d 682). Under the criminal accountability statute, § 45-2-302,

14

MCA, an accused's act of aiding or abetting need not itself be criminal in nature; it is sufficient that the act promotes or facilitates the commission of the offense. *City of Hardin v. Anthony*, 2025 MT 256, ¶ 18, 424 Mont. 500, 579 P.3d 156 (citing *Lantis*, ¶ 39). A jury may use circumstantial evidence, and the reasonable inferences drawn therefrom, to find legal accountability for another's actions. *Miller*, 231 Mont. at 511–13, 757 P.2d at 1284–85 (evidence was sufficient to support conviction of accountability for deliberate homicide even though the evidence would not have created a prima facie case against defendant); *State v. Dess*, 207 Mont. 468, 674 P.2d 502 (1984) (affirming sufficient evidence for accountability of theft of bicycles even though defendant was only seen in a car following the perpetrators on the stolen bicycles and was later stopped with one of the stolen bicycles); *Lantis*, ¶ 46 (evidence sufficient to support accountability for deliberate homicide).

¶25 Notably, in *Miller*, defendant Miller spent the evening with Wentz, who shot and allegedly killed a bartender with a shotgun. They were seen together at multiple locations, including at bars in Jefferson City and Boulder, and when Wentz picked up his shotgun and when they stole a vehicle. They were seen together shortly thereafter near the Lounge bar in Boulder around the time gunshots were heard in that area. *Miller*, 231 Mont. at 510–11, 757 P.2d at 1283–84. Miller made statements about blowing up vehicles, was observed following Wentz in a separate vehicle, attempted to keep Wentz quiet about the shooting after it occurred, fled with him when police appeared, and later gave inconsistent statements denying knowledge of the night's events. *Miller*, 231 Mont. at 510–11, 757 P.2d at 1283–84. We explained that although the evidence would not "create

15

a prima facie case against Miller" for deliberate homicide directly, the evidence was sufficient for the jury to "infer that Miller was involved in the crimes." *Miller*, 231 Mont. at 511, 757 P.2d at 1284. We affirmed Miller's conviction for deliberate homicide under the felony murder rule based on an underlying robbery and felony assault by accountability. *Miller*, 231 Mont. at 520, 757 P.2d at 1290.

¶26 The State presented ten witnesses and published the text messages between Sterling and Burghduff, portions of Burghduff's interview with Agent Tucker, and information from *The Town* video clip, in which a violent assault occurred, including a shooting. After Sterling instructed Burghduff to watch the 4 minute and 20 second video a second time, he responded to Sterling 3 minutes and 44 seconds later by asking, "we gotta hurt someone or something?" Sterling responded, "something like that," but that he "[couldn't] say much else on here." Burghduff later acknowledged to Agent Tucker that, from the video, he knew they were going to "f*** somebody up," although he initially thought it was related to drugs. He and Sterling then discussed meeting up in Ludlow, and Sterling asked Burghduff to bring a gun, which he did. Although Burghduff initially claimed he did not know they were headed to Fallon until after they departed from Baker, he later acknowledged to Tucker that, after speaking directly with Sterling and while still in Ludlow, he "had an idea" Sterling's plan was to confront Isaac because Sterling had said he was going to "take care of" Isaac, and that "he understood" Sterling's reasoning for doing so in light of the custody dispute. He also knew up front that, in addition to his own gun, Sterling had brought at least two long guns. He joined Sterling on this trip, including leaving his cell phone, along with Sterling's, in his car, which remained in Ludlow, and

16

driving for several hours over backroads to Fallon. On the way, in Baker, Burghduff purchased and filled a gas can at Sterling's direction. On the way to Fallon, Sterling took out his .45 pistol and checked it for bullets, which is the point Burghduff claims it became clear to him what Sterling was going to do. In Fallon, Burghduff watched Sterling leave the truck with his .45 pistol, and he stayed with the running truck until Sterling returned, leaving together. He acknowledged saying to himself at that time that he was an "accessory."

¶27 Construing the evidence in the light most favorable to the prosecution, *Lantis*, ¶ 32, we conclude there was sufficient evidence introduced from which a reasonable jury could find that Burghduff, "either before or during" the assault with a weapon upon Isaac, acted "with the purpose to promote or facilitate" its commission by "aid[ing], abet[ting], agree[ing], or attempt[ing] to aid" Sterling "in the planning or commission of the offense." Section 45-2-302, MCA. A reasonable jury could infer that Burghduff's continued presence and participation provided Sterling with logistical support and assistance. A reasonable jury could infer that Burghduff and Sterling acted in concert to complete the assault on Isaac. *Miller*, 231 Mont. at 511, 757 P.2d at 1284. While Burghduff points out perceived gaps in the evidence and his own interpretations of the record, such as his claim he was an "unwilling passenger," the question is whether the admitted evidence was sufficient for a reasonable jury to find the elements of the charge, and "not whether the evidence could have supported a different result." *State v. Weigand*, 2005 MT 201, ¶ 7, 328 Mont. 198, 119 P.3d 74. His contentions that there was no evidence of an agreement between the two, or any proof that he had knowledge of Sterling's intention, fail to

17

recognize the inferences a reasonable jury could have made from the breadth of evidence introduced, some of which Burghduff's arguments fail to account for, such as the gun he brought on the trip, the guns Sterling brought, and his acknowledgment of his early understanding of Sterling's intentions to harm Isaac. Although mere presence at the scene of a crime is insufficient to establish criminal liability, the jury could reasonably have found that Burghduff's conduct went far beyond mere presence. The extent of the evidence here distinguishes and makes unpersuasive from comparison our decisions in *Flatley* and *Murphy* and is much closer to the record we held was sufficient in *Miller*.

¶28 We conclude the District Court did not err by denying Burghduff's motion to dismiss the Deliberate Homicide charge based upon accountability for assault with a weapon for insufficient evidence.

¶29 Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER

Justice James Jeremiah Shea has recused himself and has not participated in this matter.

18